**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John DIETRICH, Defendant–Appellant.**

**No. 87–1288.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1988.
Decided Aug. 23, 1988.

Donna J. Cunningham, Schaumburg, Ill., for defendant-appellant.

Gwenn R. Rinkenberger, U.S. Atty's Office, Hammond, Ind., for plaintiff-appellee.

Before WOOD, Jr., FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

John Dietrich was convicted of conspiring to sell counterfeit notes in violation of 18 U.S.C. § 371 and selling counterfeit notes in violation of 18 U.S.C. § 473. Dietrich appeals his conviction on three grounds. First, he claims that reversible error occurred when a government witness testified about taking a polygraph examination. Second, Dietrich contends that the district court committed plain error when it admitted a witness' prior inconsistent statement as substantive evidence. Finally, he asserts that it was plain error for the court to allow the government to question a Secret Service Agent regarding Dietrich's daughter's alleged role in providing information about her father, particularly when no substantive evidence was admitted to support this allegation. We affirm.

## I.

On September 26, 1985, Dietrich telephoned a long-time friend, Noel Ammerman, and informed him that he was planning a trip from Indiana to Missouri, where Ammerman was living at the time. Shortly thereafter, Dietrich and his neighbor, Tom Westbrook, travelled to Missouri. Upon their arrival, Dietrich and Westbrook contacted Ammerman who introduced them to Norman Ellsworth. Ellsworth met Dietrich and Westbrook at their hotel, and the three then discussed a possible sale of

counterfeit $100 federal reserve notes. After Dietrich showed Ellsworth some sample counterfeit $100 bills that he had brought with him, Ellsworth agreed to purchase approximately $20,000 worth of the counterfeit currency, at a price of $40 for each counterfeit $100 note. Once the terms of the sale were agreed upon, Dietrich and Westbrook returned to Indiana.

On October 7, 1985, Dietrich notified Ammerman that the counterfeit money was ready for pick-up in Indiana. Ammerman then contacted Ellsworth and together they travelled to Indiana. When they arrived in Hammond, Indiana, they called Dietrich and told him that they were prepared to purchase $27,000 of counterfeit $100 bills. Dietrich then met Ammerman and Ellsworth at their hotel and informed them that the counterfeit currency was not yet ready. On October 9, 1985, after a few more delays, Dietrich again met with Ammerman and Ellsworth and sold them approximately 250 counterfeit $100 federal reserve notes for $11,000 of genuine currency.

Following the purchase, Ellsworth and Ammerman travelled to Michigan where they began passing the counterfeit $100 bills. The counterfeit bills were discovered, and when Ammerman and Ellsworth returned to Missouri they were arrested on charges of passing counterfeit currency. Several days later, on October 11, Dietrich's wife and daughter were questioned by the Secret Service concerning their possible use of counterfeit currency. That same day Dietrich took a bag of counterfeit $100 bills to Westbrook's home and asked him to bury the money until the police's suspicion lessened. Although Westbrook initially buried the money as Dietrich had requested, a few days later Westbrook fled to Mississippi with the bag of counterfeit currency. Westbrook was arrested for passing counterfeit $100 bills in Mississippi, and was eventually convicted.[1]

On August 22, 1986, a grand jury returned a three-count indictment against Dietrich and Ellsworth. Count I charged both Dietrich and Ellsworth with conspiring to pass, utter, publish, and sell counterfeit federal reserve notes, and conspiring to buy, sell, exchange, transfer, receive, and deliver counterfeit currency in violation of 18 U.S.C. § 371.[2] Count II charged Dietrich alone with selling, exchanging, and transferring counterfeit federal reserve notes in violation of 18 U.S.C. § 473.[3] Finally, Count III charged Ellsworth with buying and receiving counterfeit currency in violation of 18 U.S.C. § 473.

Ellsworth pled guilty to Count I of the indictment prior to trial, and the government dismissed Count III. On December 9, 1986, following a two-day jury trial, Dietrich was found guilty on Counts I and II of the indictment. He was sentenced to a term of four years' imprisonment on each Count, with the sentences to run consecutively.

## II.

Dietrich's first argument on appeal is that reversible error occurred when Ammerman, testifying as a government witness, stated that he had taken a polygraph examination. Although Ammerman testified against Dietrich at trial, prior to the trial he made several statements exculpating the defendant. During direct examination, the Assistant United States Attorney asked Ammerman about these prior incon-

---

1. At Dietrich's trial, the government called an expert who testified that all of the seized bills that were passed by Ellsworth, Ammerman, and Westbrook were printed by the same press.

2. In pertinent part, 18 U.S.C. § 371 provides that:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 473 provides that:

 Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

sistent statements, and the following exchange took place:

> Q: Alright. But the fact is that you proceeded to give a detailed statement about what happened afterwards, right?
>
> A: Yes, sir.
>
> Q: And that was the truth, right?
>
> A: Yes, sir, and took a polygraph test.

As soon as Ammerman referred to his polygraph examination, Dietrich's counsel asked to approach the bench. At that point, the judge instructed the jury that "Well, the remark of the defendant—not the defendant, but the witness is stricken from the record, and I will admonish this jury to disregard it." Notwithstanding this instruction to the jury, Dietrich moved for a mistrial. The district court denied the mistrial motion and made no further admonishment to the jury about the polygraph testimony. On appeal Dietrich argues that Ammerman's testimony about the polygraph test constitutes reversible error.[4] Dietrich also asserts that the district court committed plain error when it failed to give a cautionary instruction to the jury at the conclusion of the evidence on the issue of the inadmissibility of the polygraph evidence. We hold that the district court did not err in any aspect of its handling of the polygraph testimony.

### A.

█ In this circuit, the admissibility of polygraph evidence is left to the discretion of the district judge. *See, e.g., Simmons, Inc. v. Pinkerton's, Inc.,* 762 F.2d 591, 604 (7th Cir.1985). "A district court's decision concerning polygraph results deserves considerable deference." *United States v. Williams,* 737 F.2d 594, 611 (7th Cir.1984). Thus, on appeal we will not reverse a decision to admit or exclude this type of evidence absent an abuse of discretion. *United States v. Rumell,* 642 F.2d 213, 215 (7th Cir.1981).

District judges generally exercise their discretion in this area in favor of excluding

polygraph evidence, because doubts about the probative value and reliability of this evidence are usually found to outweigh the risk of prejudice. *Id. See also United States v. Tucker,* 773 F.2d 136, 141 (7th Cir.1985), *cert. denied,* 478, U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986) (if the person taking the test refuses to agree beforehand to its admissibility irrespective of the test's outcome, the polygraph's reliability is even more questionable). In the present case neither party argues that the district court abused its discretion in excluding Ammerman's testimony that he had taken a polygraph examination. Rather, Dietrich asserts that the court's admonishment to the jury to disregard the statement was insufficient to cure the error that he contends occurred the instant Ammerman mentioned the polygraph.

█ Immediately after Ammerman referred to the polygraph test, the judge struck the statement from the record and admonished the jury to disregard that evidence. To the extent that Ammerman's testimony might have caused error, the district court's immediate limiting instruction cured that potential error. *See Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954) ("Our theory of trial relies upon the ability of a jury to follow instructions."). Dietrich claims that immediately after the statement was made, the judge should have given a more detailed instruction explaining that polygraph evidence is generally inadmissible because these tests are considered unreliable. Dietrich, however, never asked for a more detailed instruction. The judge's instruction was sufficient to cure any potential error that may have occurred as a result of Ammerman's testimony, and therefore its failure to give a more detailed immediate instruction did not cause plain error. *See United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987) ("plain error must be of such great magnitude that it probably changed the outcome of the trial.").

---

4. Dietrich does not challenge the district court's denial of his mistrial motion. That argument is therefore waived.

## B.

Dietrich also claims that the district court's failure to give a cautionary jury instruction on the issue of the polygraph testimony at the close of the evidence requires a reversal of his conviction. Dietrich, however, failed to proffer any jury instructions relating to this issue, nor did he object to the final jury instructions on the ground that they should contain an instruction on the polygraph question.

Federal Rule of Criminal Procedure 30 provides in part that "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Where a party fails to make a specific objection to a jury instruction at trial, on appeal we must analyze the alleged error under the "plain error" standard. *See United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir.1988). Thus, we cannot reverse Dietrich's conviction on the ground that the district court failed to properly instruct the jury on the polygraph issue absent a showing of plain error.

A plain error is an error that is "not only palpably wrong but [is] also likely to cause the outcome of the trial to be mistaken." *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir.1986). "A reversal on the basis of plain error can be justified 'only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice.'" *Requarth*, 847 F.2d 1254 (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)). *See also United States v. Wynn*, 845 F.2d 1439, 1443 (7th Cir.1988) (an appellate court can reverse a conviction under the plain error standard only if the defendant can show that but for the improperly admitted evidence he or she probably would have been acquitted).

■ We cannot find that the district court's failure to give a cautionary instruction on the polygraph evidence as part of the final jury instructions constituted plain error. Ammerman's testimony on this issue was immediately stricken from the record, and the court admonished the jury not to consider it. An instruction at the close of the evidence might have aggravated the situation by reminding the jury about this questionable evidence. Moreover, the jury's verdict did not hinge on Ammerman's credibility. We therefore hold that the district court's failure to instruct the jury on Ammerman's polygraph testimony did not cause a miscarriage of justice and thus does not rise to the level of plain error in this case.

## III.

Dietrich's second contention on appeal is that the district court erred when it admitted a prior inconsistent statement of one of the government's witnesses as substantive evidence. On October 11, 1985, Angel Thomas gave a written sworn statement to two Secret Service Agents. In her statement, Thomas indicated that she and her common-law husband, Charles Peek, had met with Dietrich and his wife. During the meeting Dietrich supposedly showed Thomas and Peek a number of counterfeit $100 federal reserve notes and assured them that the bills were easy to pass. According to Thomas' statement, Dietrich wanted Peek and Thomas to get rid of $10,000 worth of counterfeit currency. Thomas further stated that neither she nor Peek took any of the counterfeit money, and that she never saw Dietrich after their meeting.

At trial Thomas testified that she did not know John Dietrich. When the Assistant United States Attorney pointed to Dietrich in the courtroom, Thomas testified that she had never seen him before. As a result, the government sought to question Thomas on her prior inconsistent statement. In response to this line of questioning, Thomas admitted making the statement. She testified, however, that she had lied during the interview to help Peek, who was then awaiting trial on separate counterfeiting charges. Thomas further testified that the agents who took the statement pressured her into giving it by threatening to arrest her on charges of passing counterfeit cur-

rency unless she told them about Dietrich. According to Thomas, she made up the story about Dietrich to avoid arrest and to help her husband. When the government then moved to admit Thomas' prior statement, the defendant neither objected to its admission nor requested a cautionary instruction on the proper use of the statement. On appeal, Dietrich contends that the admission of this statement as substantive evidence constituted plain error.

■ In contrast, the government claims that the statement was properly admitted under Federal Rule of Evidence 801(d)(1)(A). This Rule provides that:

(d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury *at a trial, hearing, or other proceeding, or in a deposition....*

(Emphasis added). If a prior inconsistent statement meets the requirements of Rule 801(d)(1)(A) it may be admitted as substantive evidence to establish the truth of the matter asserted. *United States v. DiCaro*, 772 F.2d 1314 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986). A prior inconsistent statement that does not meet one of the criteria of Rule 801(d)(1)(A), however, may be used only for the purpose of impeaching the witness. Fed.R.Evid. 801(d)(1)(A) (advisory committee notes).

Dietrich admits that Thomas' statement was inconsistent with her testimony at trial, and that the prior statement was given under oath subject to the penalties of perjury. Both parties admit that Thomas' interview with the Secret Service Agents did not occur during a trial, hearing, or deposition. Thus, the statement was properly admitted only if the interview constituted an "other proceeding" for purposes of Rule 801(d)(1)(A). We conclude that it did not.

■ The term "other proceeding" is not unlimited. A typical police station interrogation, for example, is not an "other proceeding" within the meaning of the Rule. *See, e.g., United States v. Day*, 789 F.2d 1217, 1222 (6th Cir.1986) (collecting cases). " 'The Rule seems to contemplate situations in which an official verbatim record is routinely kept, whether stenographically or by electronic means, under legal authority.' " *United States v. Livingston*, 661 F.2d 239, 240 (D.C.Cir.1981) (quoting 4 D. Louisell & C. Mueller, *Federal Evidence* § 419 at 171 (1980)).

■ The term "other proceeding" includes grand jury proceedings, even though the declarant is not subject to cross-examination during the grand jury proceeding. Fed.R.Evid. 801(d)(1)(A) (conference committee notes). An immigration proceeding also has been held to constitute an "other proceeding" under Rule 801(d)(1)(A). *United States v. Castro–Ayon*, 537 F.2d 1055 (9th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976). The *Castro–Ayon* court concluded that the immigration proceeding was acceptable for purposes of the Rule because it contained many of the same procedural protections as a grand jury proceeding. *Id.* at 1058. For instance, both proceedings are "investigatory, ex parte, inquisitive, sworn, basically prosecutorial, held before an officer other than the arresting officer, recorded, and held in circumstances of some legal formality." *Id.* In fact, as the court noted, a witness in an immigration proceeding is actually afforded more procedural protections than is a grand jury witness.

■ In contrast, Thomas gave her prior inconsistent statement during an interview with two Secret Service Agents in her home. When the agents arrived, they searched Thomas' home and car with her consent. They informed her that Charles Peek had been arrested, and according to Thomas they indicated that she might also be arrested for passing a counterfeit $100 bill unless she cooperated with them. Thomas then agreed to talk to the agents. No one was present during the interview except Thomas and the two agents, and the

interview was not recorded. Thomas simply spoke to the agents who then wrote down what she had told them, and she signed the written statement verifying its truth. *See Livingston,* 661 F.2d at 240 (witness' prior statement to postal inspector inadmissible under Rule 801(d)(1)(A) for failure to satisfy "other proceeding" requirement where inspector went to witness' house, asked her questions, took notes, wrote a statement based on her answers, and witness signed statement attesting to its accuracy).

Thomas' statement was given to the same agents who had the authority to arrest her, the interview was not prosecutorial, it was not recorded, and there were no indicia of legal formality. The circumstances surrounding Thomas' statement did not differ significantly from a typical police station interrogation. Thomas' interview therefore does not qualify as an "other proceeding" pursuant to Rule 801(d)(1)(A), and the admission of her statement was erroneous.[5]

 Because Dietrich again failed to make a timely objection, however, the admission of Thomas' prior inconsistent statement requires reversal only if its admission created plain error. *See United States v. Wynn,* 845 F.2d 1439, 1442–43 (7th Cir. 1988). The government's case against Dietrich was not based primarily on Thomas' credibility, nor was her October 11 statement the most direct link between Dietrich and the counterfeiting conspiracy. We therefore conclude that the admission of Thomas' statement, although error, did not cause a miscarriage of justice. Thus, no plain error occurred which would justify reversing Dietrich's conviction.

### IV.

 Dietrich's final argument on appeal is that the district court erred when it permitted a government witness to testify that the defendant's daughter contacted the Secret Service to provide evidence against her father. The government failed to submit any evidence to support this allegation. Because the defendant failed to object to the admission of this testimony at trial, however, we must again analyze this alleged error under the plain error doctrine.

Dietrich's counsel questioned Agent Carl Janisch on cross-examination about an incident that occurred on October 11, 1985, in which Dietrich's wife and daughter were stopped and questioned by several Secret Service Agents about a counterfeit note they allegedly had passed (it was later discovered that the $100 bill in question was genuine). Because the government had not asked Janisch about this incident during direct examination, on redirect examination the government sought to clarify Janisch's role in the October 11 stop. As part of this line of questioning the following exchange took place:

Q: Are you aware, Sir, after this incident [defendant's attorney] talked about Mr. Dietrich's own daughter then voluntarily contacted the Secret Service that evening?

A: Yes, I am aware.

Q: And in fact provided some information to the Secret Service regarding her father's involvement with counterfeit hundreds, is that correct?

A: That's correct.

Dietrich argues that this testimony created plain error requiring the reversal of his conviction. According to Dietrich, this testimony should have been excluded because information indicating that the defendant's own daughter turned him in was extremely prejudicial and of limited proba-

---

5. While this statement should not have been admitted as substantive evidence, it could have been properly used to impeach Thomas. Some commentators have questioned the ability of jurors to distinguish between the use of evidence for impeachment purposes and its substantive value. *See, e.g.,* 4 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 801(d)(1)(A)[01]. The distinction is important, however, for the continued vitality of the Rules as drafted. *Livingston,* 661 F.2d at 243. *See also United States v. Ragghianti,* 560 F.2d 1376, 1381 (9th Cir.1977) ("There is a crucial distinction between the use of a prior inconsistent statement of a witness only to impeach the credibility of the witness and its use to prove as a fact what is contained in the statement.").

tive value. *See* Fed.R.Evid. 403. Dietrich also contends that this testimony (which was never supported by substantive proof) significantly bolstered the credibility of the government's witnesses.

The government argues that this testimony was proper because Dietrich "opened the door" to this line of questioning by asking Agent Janisch on cross-examination about the October 11 incident. The government asserts that the defendant's cross-examination implied that the Secret Service Agents had done something improper when they stopped Dietrich's wife and daughter. The questions about the stop on redirect examination, the government argues, were simply designed to demonstrate the voluntary nature of Dietrich's daughter's involvement in the investigation.

Because we conclude that Dietrich has failed to establish that but for the admission of this testimony he probably would have been acquitted, *United States v. Wynn*, 845 F.2d 1439, 1443 (7th Cir.1988), we find that the admission of this evidence did not create plain error. Agent Janisch testified only that Dietrich's daughter voluntarily contacted the Secret Service and provided some information about her father. Janisch did not detail what that information was, nor did he indicate whether it was even important to the on-going investigation of Dietrich. Nor was Janisch's testimony on this point crucial to the government's case against Dietrich. We hold that Janisch's testimony did not create a miscarriage of justice and therefore no plain error occurred in this case.

### V.

In summary, we hold that the district court's immediate instruction cured any error that may have resulted from Noel Ammerman's reference to a polygraph examination he had taken, and that the district court's failure to include a jury instruction on the issue of the polygraph evidence was not plain error. While the district court erred in admitting Angel Thomas' prior inconsistent statement as substantive evidence under Federal Rule of Evidence 801(d)(1)(A), its admission did not cause a miscarriage of justice. Finally, Agent Janisch's reference to Dietrich's daughter's alleged role in providing information about her father was not plain error. The judgment of the district court is therefore AFFIRMED.