COFFEY, Circuit Judge.
 

 Duane Olson and George Morris were convicted by a jury of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Additionally, Olson was convicted of distributing cocaine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Olson to 324 months and Morris to 240 months in confinement. Olson and Morris appeal their convictions on multiple grounds. Their appeals have been consolidated. We affirm.
 

 
 *1474
 
 I. BACKGROUND
 

 The conviction of Duane Olson and George Morris arose from the sale of cocaine on June 26, 1990 to Karl Fessler a Drug Enforcement Agency (“DEA”) informant under the supervision of DEA agent Clifford Best. Fessler went to a hotel in Lombard, Illinois (near Chicago) to meet Olson and Morris. Fessler entered Olson’s room and told him the money was downstairs in his van. Olson replied that the cocaine was not in the room. He phoned Morris in. another room and told him to “bring the running suits up.” Morris appeared at Olson’s door with a grey duffel bag on his shoulder. Olson told Fessler there were ten kilograms in the bag. Fes-sler requested that Olson open the bag and show it to him. Either Morris or Olson, while in each other’s presence, opened the bag revealing 8% kilograms of a white substance in the shape of hockey pucks wrapped in towels and one kilogram wrapped in duct tape.
 
 [1]
 
 Fessler advised Olson that the cocaine was acceptable and suggested that Morris carry the cocaine to the van where he would be paid.
 

 Morris and Fessler left the room together and met Cliff Best in the lobby. As the three men left the hotel and walked across the parking lot, undercover DEA agents arrested Morris. Thereafter, the DEA Agents searched Morris’ hotel room and found another duffel bag containing seven kilograms of a flaky white substance (later determined to be cocaine). The agents proceeded to Olson’s room where they arrested him.
 

 Because several of appellants’ arguments concern the credibility of DEA informant Karl Fessler, further background facts are relevant to the disposition of this matter.
 

 Appellant Olson acknowledges an association with Fessler beginning in 1976. Olson asserts that he “loaned” Fessler $20,-000 for a transaction involving a sale of coffee to Cuban food brokers. The “coffee deal” was an elaborate fraud in which Fes-sler obtained a line of credit from Cuban banks to Canadian banks for a coffee shipment. The coffee never existed, rather, Fessler purchased a ship, insured it, and planned to sink it (alleged coffee and all) in route to Cuba. After investigation and upon discovery of the fraud, Fessler was charged and extradited to Canada for trial while the United States Treasury Department froze his assets.
 

 In 1984, Fessler was convicted in federal court of conspiracy to possess narcotics and he now admits he took the stand and lied during that trial. Upon release from prison, Fessler was paroled and deported to his native Germany on February 16, 1989.
 

 Later in 1989, Fessler contacted the DEA investigator responsible for his conviction and requested that he be allowed to return to the United States and become a paid drug informant. Fessler provided the names of
 
 35
 
 people he suspected of narcotics involvement. (Olson was on the list, Morris was not). The DEA responded by making arrangements for Fessler to reenter the United States under the supervision of DEA agent Clifford Best.
 

 Upon arrival in the United States, Fes-sler was interviewed for two days and subjected to a polygraph test. The polygraph test indicated that Fessler had been untruthful when asked during the two day briefing whether he had supplied any false information to the DEA. The polygraph expert, DEA Agent Behrmann, confronted Fessler and he admitted to his deception by explaining his uncertainty regarding the potential of successful investigations against all the targets he had named.
 

 Despite Fessler’s apparent unreliability, Agent Best decided to make use of him in an investigation. Between January and late March the DEA sought and obtained approval from the U.S. Parole Commission for Fessler to work as a cooperating individual.
 
 [2]
 

 
 *1475
 
 On January 24, 1990, Best had Fessler write letters to a number of the 35 people suggesting they “talk business.” Olson responded immediately, stating that he had “[l]ots to talk about some day” and provided a telephone and facsimile (“fax”) number.
 

 Between March 1990, and June 21, 1990, Fessler and Olson engaged in numerous phone conversations, fax exchanges, and even met “eyeball to eyeball” in Florida on May 18, 1990 to discuss drug transactions. Fessler was able to tape record some of the conversations while others he merely recorded by written notes. All of the communications involved “Drugspeak” (using code language to disguise the nature of the discussions). Olson informed Fessler that “property” (cocaine) was scarce and going for “24-25 dollars an acre up to 29 dollars an acre” ($24-25,000 up to $29,000 per kilogram).
 

 The substance of the negotiations involved Fessler purchasing large quantities of cocaine. Olson claimed he could provide both Columbian (soft, flaky cocaine) and Bolivian (hard 250 gram cocaine pieces resembling hockey pucks) and that his driver (Morris) could deliver it from Florida to Chicago. At a prearranged meeting on June 21, 1990, Fessler and Olson met in a Chicago hotel where Olson provided a 250 gram sample of Bolivian cocaine.
 
 [3]
 
 Olson told Fessler that if it was satisfactory the purchase price would be $6500. The next day, under the direction of DEA Agent Best, Fessler called Olson informing him that the cocaine was satisfactory and he would purchase it. Shortly thereafter, Fes-sler met Olson at the hotel and paid $6500 for the sample. At this meeting, Olson also informed Fessler that he had another kind of cocaine (flaky) that he would bring as a sample.
 

 Olson suggested to Morris that he rent a car and meet him in Florida. Morris rented a car in his own name in Chicago and drove to Florida where he met up with Olson at his Florida home.
 

 While Morris was having a sandwich in the house, Olson placed two duffel bags in the trunk of Morris’ rented car (one containing seven kilograms of flaky Columbian cocaine and the other containing nine kilograms of Bolivian “hockey puck” cocaine and one kilogram of Columbian). Thereafter, Morris returned to Chicago and met Olson at the hotel pursuant to Olson’s instructions.
 

 On June 25, 1990, Olson called Fessler from the hotel in Lombard, Illinois and explained that he had less of the Bolivian cocaine but had eight kilograms of Colum-bian. On the morning of June 26, 1990, Fessler met Olson at- the hotel and they discussed quantity and price ($253,000), and at this time, Morris called Olson in his room and told him he would arrive in about five hours. Olson gave Fessler forty banking envelopes in which to place the money and they parted, agreeing to meet later that evening.
 

 That afternoon, Morris arrived at the hotel and carried the two duffel bags to his room. Later in the evening, while under DEA surveillance, Fessler returned to the hotel with the $253,000 in cash. Shortly thereafter, the DEA agents arrested Morris and Olson and seized the cocaine.
 

 At trial, Olson took the stand and neither denied the negotiations nor the delivery of the cocaine. Rather, Olson asserted and the jury rejected an entrapment defense. Morris did not take the stand (the jury was appropriately instructed not to weigh this against him).
 

 II. ISSUES
 

 Appellant Morris raised the following questions on appeal:. 1) whether the trial court erred in not disclosing the govern
 
 *1476
 
 ment informant’s address to facilitate the defendants’ trial preparation (the defendant asserts that this ruling denied him due process of law and his Sixth Amendment right to confront his accusers); 2) whether the district judge misstated the law when instructing the jury regarding Morris’ involvement in a conspiracy, and 3) whether the evidence at trial was sufficient to establish that Morris was guilty of the charged crimes beyond a reasonable doubt.
 

 Appellant Olson raised the same argument as to the trial court’s refusal to disclose Fessler’s address. He also argues that the trial court erred in, 1) ruling as inadmissible evidence of Fessler’s failed polygraph examination; 2) refusing .to grant a mistrial for the government’s violation of a pre-trial order against inquiring into Olson’s tax filings, and 3) failing to uphold a motion invoking the outrageous government conduct doctrine. Additionally, we will address Olson’s entrapment argument which he discussed extensively in oral argument but failed to set forth in his appellate brief.
 

 III. DISCUSSION
 

 A. DISCLOSURE' OF WITNESS’ • ADDRESS ■
 

 Both Olson and Morris claim the trial court’s failure to order production of the confidential informant’s address denied them their due process and their Sixth Amendment right to confront their accusers. The defendants rely on
 
 Smith v. Illinois,
 
 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968), in which the United States Supreme Court stated:
 

 “[t]he witness’ name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.”
 

 Id.; see also Alford, v. United States,
 
 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931) (requiring an opportunity “to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them ... ”).
 

 As we held in
 
 United States v. Navarro,
 
 737 F.2d 625 (7th Cir.1984),
 
 “Alford
 
 and
 
 Smith
 
 thus make it clear that a defendant is presumptively entitled to cross-examine a key government witness as to his address and place of employment.”
 
 Id.
 
 at 633. Denial of this right, however, does not automatically necessitate a new trial.
 
 Id.
 
 On review, we seek to discover if there is justification for the denial and “whether suppression of this information emasculated the defendants’ right of cross-examination by restricting counsel’s opportunity to impeach [the witness’] credibility and thus deny defendants a fair trial.”
 
 Id.
 

 Courts dealing with this issue weigh many factors including but not limited to: the safety of the informant,
 
 United States v. Caldarazzo,
 
 444 F.2d 1046, 1050 (7th Cir.1971);
 
 United States v. Palermo,
 
 410 F.2d 468, 472 (7th Cir.1969); the continued usefulness of a confidential informant,
 
 Navarro,
 
 737 F.2d at 633; necessity of the address due to the availability of effective impeachment evidence,
 
 see e.g., id.
 
 at 634;
 
 United States v. Large,
 
 729 F.2d 636, 640 (8th Cir.1984); and the value of the specific addresses in aiding cross-examination,
 
 id.
 
 at 640.
 

 The government opposed the disclosure of the addresses because of concerns for Fessler’s safety and the lack of real need considering the extensive impeachment evidence already available. The trial judge conducted an
 
 in camera
 
 review of the evidence counseling against disclosure (a letter indicating potential threat to the informant) and the informant’s addresses. Based on the
 
 in camera
 
 review and the evidence at trial, the judge denied the motion to disclose the informant’s addresses. In the district court’s view,
 

 “reenforced by the evidence in this case, a neighborhood investigation would have made absolutely no difference, but I have to tell you that [Fessler’s] length of stay in any given place was sufficiently short and took place at least in a couple of instances in areas that really do not con
 
 *1477
 
 stitute neighborhoods that I think would have been utterly unavailing.”
 
 [4]
 

 Transcript
 
 at 799, The reenforcing evidence likely refers to the fact that defendants had ample impeachment evidence, The trial judge went so far as to instruct the jury to weigh Fessler’s testimony with’ caution because he was paid by the government and admitted to previously lying under oath.
 

 The government has stated that no standard of review is clear to gauge a trial judge’s decision to withhold disclosure of witnesses’ addresses. If viewed as a discovery matter, the “district court has wide discretion within the rules to determine the manner and course of discovery.”
 
 Eggleston v. Chicago Journeymen Plumbers’ Local Union No. 130, U.A.,
 
 657 F.2d 890, 902 (7th Cir.1981),
 
 cert. denied,
 
 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982) (quoted in
 
 United States v. Valona,
 
 834 F.2d 1334, 1341 (7th Cir.1987)). It is more appropriate, however, to view this ruling under the Sixth Amendment Confrontation Clause. “The ‘extent to which cross-examination of a witness will be allowed rests in the sound judicial discretion of the trial court.’ ”
 
 United States v. Ott,
 
 489 F.2d 872, 875 (7th Cir.1973) (quoting
 
 Beck v. United States,
 
 298 F.2d 622, 629 (9th Cir. 1962));
 
 see generally,
 
 85 A.L.R.3d 541 (1978) (discussing right to cross-examine witness regarding address). The pre-trial disclosure of a witness’ address and place of employment often directly impacts the defendants’ effective cross-examination, accordingly, the case law directs that we apply the standard of
 
 Ott.
 
 Hence, the district court’s refusal to disclose Fessler’s addresses will be overturned only upon a showing of abuse of discretion.
 
 See Alford,
 
 282 U.S. at 694, 51 S.Ct. at 620;
 
 Navarro,
 
 737 F.2d at 632.
 

 We see no reason to question the trial court’s ruling based upon its
 
 in camera
 
 review and its consideration of the com-píete trial record. Notable in this case is the ample opportunity defendants had to impeach Fessler’s testimony. They were able to bring out a prior felony conviction, a misdemeanor conviction for fraud,
 
 [5]
 
 perjury, and receipt of payment for testimony, We disagree with appellants that the trial court is guilty of abusing its discretion by refusing to order production of Fessler’s addresses.
 

 B. CONSPIRACY INSTRUCTION
 

 Morris challenged the accuracy of the trial court’s instruction regarding his involvement in the conspiracy. “In assessing claims of error in jury instructions, substantial discretion is given to the trial court with respect to the specific wording of the instructions.”
 
 United States v. Penson,
 
 896 F.2d 1087, 1090 (7th Cir.1990). “ ‘As long as the instructions treat the issues fairly and accurately, they will not be interfered with on appeal.’ ”
 
 United States v. Key,
 
 859 F.2d 1257, 1262 (7th Cir.1988) (quoting
 
 United States v. Patrick,
 
 542 F.2d 381, 389 (7th Cir.1976)).
 

 The Seventh Circuit recently enunciated an illustrative conspiracy instruction. In
 
 United States v. Martinez de Ortiz,
 
 907 F.2d 629, 635 (7th Cir.1990), we suggested,
 

 “During the trial you heard about statements made by persons who the prosecutor says are the defendants’ fellow conspirators. You may consider these statements when you decide whether the defendant joined the conspiracy. Please remember, however, that only the defendant’s own words and acts show whether he joined. You therefore should use statements by other persons to decide what the defendant did and said, or to help you understand the defendant’s acts and words. If you.decide that the defendant joined the conspiracy, you may use the statements by other persons in order
 
 *1478
 
 to decide questions that are pertinent to the other accusations against him.”
 

 We added that “[w]e do not require district judges to use this language, which may be inappropriate for a particular situation. We offer it only as an illustration.”
 
 Id.
 

 The trial judge gave the following in: struction:
 

 “In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all the alleged participants. Only the defendant’s own words and acts show whether he joined a conspiracy. But you may consider the statements of all the alleged participants to decide what it was that the defendant did and said or to help you understand the defendant’s acts and words. ■
 

 “To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.”
 

 Transcript
 
 at 781-82. Morris contends that the trial court erred by refusing to modify the last sentence of this instruction to read: “The government must prove beyond a reasonable doubt,
 
 from the defendant’s own acts and statements,
 
 that the defendant was aware of the' common purpose and was a willing participant.”
 
 Transcript
 
 at 700 (emphasis: added). The trial court refused the proposed instruction because it would have been repetitive and perhaps misstated the law. We hold that the trial court committed no error in refusing the proposed instruction since the trial court’s instruction was nearly identical to ours set forth in
 
 Ortiz.
 

 We are of the opinion that the district court instruction to the jury was proper in distinguishing between the defendant’s
 
 conduct
 
 (to show* whether he joined the conspiracy) and additional admissible evidence to establish what the defendant did and said.
 
 See Ortiz,
 
 907 F.2d at 635.
 

 C. SUFFICIENCY OF THE EVIDENCE
 

 Defendant Morris challenges the sufficiency of the evidence to establish his involvement in the conspiracy and guilt for possession with intent to distribute narcotics. In evaluating the sufficiency of the evidence challenge, we note that the appellants bear a “heavy burden”:
 

 “Initially, we ‘review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.’ ... ‘The test is whether after viewing the evidence in the light most favorable to the government,
 
 “any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” ’ ... A verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury could find guilt beyond a reasonable doubt____ In appeals of jury trials such as this case, we are obliged to “defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. Likewise, we leave the credibility of witnesses solely to the jury’s evaluation, absent extraordinary circumstances____” [W]e ‘view the evidence in the light most favorable to the government and accept circumstantial evidence as support, even sole support, for a conviction.’ ”
 

 United States v. Moore,
 
 936 F.2d 1508, 1524 (7th Cir.),
 
 cert. denied, Moore v. United States,
 
 — U.S. —, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991) (citations omitted).
 

 1. CONSPIRACY CHARGE
 

 In
 
 United States v. Navarez,
 
 954 F.2d 1375, 1380 (7th Cir.1992), we held that
 

 “[t]o prove a conspiracy, the government must show that ‘[1] there was an agreement between two or more persons to commit an unlawful act, [2] that the defendant was a party to the agreement, and [3] that an overt act was committed in furtherance of the agreement by one of the co-conspirators.’ ”
 

 Id.
 
 (quoting
 
 United States v. Muehlbauer,
 
 892 F.2d 664, 667 (7th Cir.l990)). In
 
 Nava-rez,
 
 we applied the new standard for suffi-
 
 *1479
 
 cieney of the evidence to demonstrate a particular defendant’s connection with the conspiracy. We stated, “ ‘When the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, substantial evidence should be the test rather than slight evidence or slight connection.’ ”
 
 Id.
 
 at 1375 (quoting
 
 United States v. Durrive,
 
 902 F.2d 1221, 1228 (7th Cir.1990)).
 

 Morris contends that only the highly unreliable testimony of Fessler links him to the conspiracy. Yet a review of the evidence reveals that Morris had been Olson’s driver for some 15 years (during this period both had been convicted of other drug offenses). Olson assured Fessler that Morris could transport the cocaine from Florida to Chicago. Olson instructed Morris to rent a car and meet him in Florida where Olson placed the cocaine (reeking of ether) in the car. Morris subsequently transported the cocaine to the hotel in Lombard, Illinois, where he carried the two duffel bags full of cocaine to his hotel room. He later delivered one of the bags to Olson’s room (in response to Olson’s request to “bring up the running suits”)
 
 [6]
 
 and either Olson or Morris opened the bag revealing the contents to Fessler. The DEA agents subsequently arrested Morris who was carrying the cocaine to Fessler’s van to receive payment. After his arrest, DEA agents searched Morris’ hotel room and found seven kilograms of cocaine (worth $175,000-200,000). These facts alone are sufficient that a reasonable jury could find Morris was a participant in the conspiracy.
 

 2. POSSESSION CHARGE
 

 To convict Morris of possession with intent to distribute cocaine, “the government had the burden of proving Morris [1] knowingly or intentionally possessed cocaine; [2] possessed cocaine with the intent to distribute it; and [3] knew the substance was a controlled substance.
 
 See
 
 21 U.S.C. § 841(a)(1).”
 
 United States v. Troop,
 
 890 F.2d 1393, 1398 (7th Cir.1989).
 

 Morris argues that because he was not involved in the drug negotiations nor any recorded phone conversation, he contends that the only evidence to convict him is the impeached testimony of Fessler but the record indicates otherwise. We hold that when applying the ruling case law by taking the reasonable inferences drawn from the evidence in the light most favorable to the government, a rational trier of fact could and would have found the essential elements of possession with intent to distribute.
 

 Morris maintained a fifteen year relationship with a convicted drug dealer. Fes-sler’s testimony established that Olson entrusted Morris to deliver the cocaine (with a wholesale value of roughly $440,000 and a street value (retail) in excess of $2.5 million) from Florida to Chicago.
 
 [7]
 
 Morris rented a car in Chicago and drove it to Florida to pick up two duffel bags (weighing approximately thirty-five pounds which Olson called “the running suits”). Presumably Morris drove (a common drug world practice) to avoid detection in airports. Olson instructed Morris to return to the hotel in Chicago and not to break any laws, i.e., speeding. Morris followed the instructions and carried the duffel bags (smelling of ether, commonly used in preparing cocaine) into his hotel room. As directed, when Olson called him, he delivered one of the bags to Olson’s room. Morris was present
 
 *1480
 
 when the bag was opened (Fessler testified that Morris opened the bag) displaying about nine kilograms of cocaine. Morris carried the duffel bag out of the hotel with Fessler to exchange it for $253,000. DEA agents arrested him and subsequently found the second duffel bag with seven kilograms of cocaine in his hotel room.
 

 George Morris may not have been the “brains” behind the transaction, but he most certainly knew what was going on and was an integral and active member of the conspiracy to possess and distribute cocaine. The evidence in support of his conviction is overwhelming.
 

 D. POLYGRAPH RESULTS
 

 Olson objects to the district court’s refusal to admit results of a polygraph test taken by Fessler on January 19, 1990. During the course of that polygraph examination, the examiner detected “deception” by Fessler in answer to a question whether he had supplied false information to the DEA. Fessler later explained that he wasn’t sure if all the people whose names he had given the DEA would respond to his overtures to engage in drug transactions. This explanation is quite reasonable given that no one can be certain of a prediction and that taken as a whole, Fessler’s polygraph exam was very positive. Olson sought to introduce the polygraph results to discredit Fessler as to the initial information which led to contact with Olson, and generally for its relevance on the issue of Fessler’s credibility.
 

 “In this circuit, the admissibility of polygraph evidence is left to the discretion of the district judge.”
 
 United States v. Dietrich,
 
 854 F.2d 1056, 1059 (7th Cir.1988). “A district court’s decision concerning polygraph results deserves considerable deference.”
 
 United States v. Williams,
 
 737 F.2d 594, 611 (7th Cir.1984). Reversal will only occur when the district court has abused its discretion.
 
 Dietrich,
 
 854 F.2d at 1059. “An appellant’s burden is heavy to convince us that a reversible error occurred.”
 
 Williams,
 
 737 F.2d at 611.
 
 [8]
 

 When dealing with the admissibility of polygraph evidence, and the accuracy thereof, the trial court must engage in a delicate balancing of many factors including probative value, prejudicial effect, confusion of the issues, misleading the jury, and undue delay.
 
 See id.; Dietrich,
 
 854 F.2d at 1059. In a well-reasoned ruling, the district court denied defendant’s motion because it would “take us on a course of action that’s too far away from the core issues of this case.”
 
 Transcript
 
 at 21. The trial court was no doubt affected by the plethora of impeachment evidence already available to the defense against Fes-sler. Moreover, the deceptive statement was immaterial, for it did not involve the guilt or innocence of Olson.
 

 At trial, Fessler made reference to the' polygraph examination, at which time Olson’s counsel asked the court to reconsider its ruling on the admissibility of the polygraph results. The trial court directed counsel to proceed with the cross-examination but not to discuss the polygraph results. Appellant contends that Fessler’s reference to the polygraph exam, without revealing that he failed the exam, placed in the jury’s mind the belief he had passed the test. The trial court was unswayed by this argument; we likewise are unswayed. Because the defendant had ample opportunity to discredit Fessler’s testimony and the specific question to which Fessler deceived the polygraph examiner was merely peripheral, we rule that no reversible error occurred.
 
 [9]
 

 E. EVIDENTIARY RULING
 

 In a pre-trial ruling, the district court barred evidence as to the income tax filings of the defendants. On cross-examination, however, the government asked 01-
 
 *1481
 
 son about his 1985 and 1986 filings.
 
 [10]
 
 . Before Olson answered, his counsel raised an objection that the trial court sustained. At a sidebar conference, the government explained the purpose was for impeachment and the pre-trial order merely barred substantive use of tax records. The trial court was unpersuaded and sustained the objection.
 

 Taking the question in the context of the whole trial,
 
 see Darden v. Wainwright,
 
 477 U.S. 168, 179, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), we apply the
 
 Chapman
 
 harmless error standard,
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which is more demanding than a fundamental fairness inquiry under the due process clause.
 
 Greer v. Miller,
 
 483 U.S. 756, 765 n. 7, 107 S.Ct. 3102, 3109 (1987). Because the trial court sustained the objection to the tax filing and our review fails to indicate misconduct on behalf of the government, we find no prejudice to the defense and no grounds for reversal.
 
 See United States v. Brown,
 
 688 F.2d 1112, 1118 (7th Cir.1982).
 

 F. OUTRAGEOUS GOVERNMENT CONDUCT
 

 Appellant Olson alleges that the DEA engaged in outrageous misconduct denying the defendant due process of law. Olson lists six DEA acts that he claims cumulatively constitute outrageous misconduct. He asserts that the DEA facilitated the illegal reentry of a deported alien by failing to obtain prior approval of the Attorney General. The second charge is that the DEA misrepresented Fessler’s polygraph results. In a letter to the Parole Commission, the DEA stated that he “passed” the polygraph test without mention of his deception. Third, Fessler wrote a letter to Olson suggesting they “talk business” prior to the DEA obtaining Parole Commission authorization to use Fessler as a cooperating individual. Fourth, in the letter seeking Parole Commission authorization, the DEA indicated Fessler “will not be present when sales of drugs are consummated or when arrests take place ... at no time will Fessler be authorized to handle any contraband or weapons.” The DEA did not adhere to this assertion. Fifth, Olson contends that engaging Fessler in a contingent fee arrangement constitutes outrageous misconduct. Finally, he claims the DEA purposely failed to preserve evidence by not recording the initial phone conversation between Fessler and Olson. Olson properly raised this defense prior to trial. In a separate hearing, subsequent to trial, the trial court denied the motion.
 

 The outrageous government conduct doctrine presents a narrow opportunity for a defendant to challenge government conduct violating his due process rights. The argument, a theory, is derived from dicta in
 
 United States v. Russell,
 
 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), where the court stated, “we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.”
 
 Id.
 
 This circuit has expressed doubt as to the validity of the doctrine,
 
 see e.g., United States v. White,
 
 950 F.2d 426, 431 (7th Cir.1991), and has “never reversed. a conviction on this ground.”
 
 Id.
 
 At least one member of this circuit court has called for an outright rejection of the doctrine of outrageous government conduct.
 
 See United States v. Miller,
 
 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring). Furthermore, a plurality of the Supreme Court has raised doubt as to the validity of the doctrine.
 
 Hampton v. United States,
 
 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976).
 

 Hampton
 
 suggested that the remedy of a criminal defendant who actively participates with government agents in the commission of a crime is limited to the entrapment defense.
 
 Id.
 
 Based on
 
 Hampton,
 
 
 *1482
 
 this circuit has questioned the validity of the
 
 Russell
 
 dictum on outrageous government conduct.
 
 See United States v. Bontkowski,
 
 865 F.2d 129, 131-32 (7th Cir.1989);
 
 United States v. Williams,
 
 858 F.2d 1218, 1225 (7th Cir.1988),
 
 cert. denied sub nom. Froschauer v. United States,
 
 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). To date, however, neither the Supreme Court nor this circuit has expressly ruled on the doctrine of outrageous governmental conduct.
 
 Miller,
 
 891 F.2d at 1267 n. 2.
 

 We review this matter
 
 de novo. United States v. Valona,
 
 834 F.2d 1334, 1343 (7th Cir.1987). “Whether the government has stepped beyond permissible constitutional bounds in attempting to enforce the law is a legal question, not a factual one.”
 
 United States v. Swiatek,
 
 819 F.2d 721, 726 (7th Cir.1987). ,We agree with the trial court ruling that most of the alleged acts of misconduct amount to mere administrative errors. This includes facilitating Fessler’s reentry into the United States, allegedly misrepresenting his polygraph results, use of Fessler as an informant prior to approval, and failure to fully comply with terms of a letter from the DEA to the Parole Commission. Additionally, we note that Olson has no standing to challenge these violations. “The limitations of the due process clause ... come into play only when the government activity in question violates some protected right of the
 
 defendant.” Hampton,
 
 425 U.S. at 490, 96 S.Ct. at 165Q (emphasis added). In characterizing these violations as administrative, we determine that the harm was not to the defendant Olson but rather to the Attorney General or the Parole Commission.
 

 Olson also challenges the use of a contingent fee arrangement between the DEA and Fessler. “This court has concluded that contingent fee payments to government informants are not per se outrageous; rather the jury may consider such arrangements as evidence relating to the informant’s credibility.”
 
 Miller,
 
 891 F.2d at 1268. As previously remarked, the trial court instructed the jury to weigh the credibility of Fessler because he had received payment from the government. No injury accrued to Olson due to the DEA’s failure to see that Fessler applied payments to a past judgment. Moreover, this failure does not amount to government misconduct.
 

 We also conclude that the evidence fails to support Olson’s claim of the government’s purposeful failure to preserve evidence. Olson alleges that the DEA should have recorded the crucial first conversation between he and Fessler. In light of
 
 Jacobson v. United States,
 
 — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), it is conceivable that a deliberate failure to preserve evidence of initial contacts with a suspect may raise doubt as to the defendant’s predisposition to commit the crime. That is not the case here where the defendant had already indicated a predisposition to commit the crime (prior convictions, association with drug trade and prompt reply to Fessler’s request to “talk business”). Rather than amounting to outrageous misconduct, we conclude that such a government act may result in insufficient evidence to demonstrate the defendant’s predisposition. Moreover, the failure to record the initial contact appears less deliberate and more a result of negligence by failing to get a recording device from the Chicago DEA office to Fessler in Florida. Mere negligence cannot serve as the predicate for government misconduct.
 

 Finally, taken as a whole, the acts of the DEA fall far short of meeting the standard of outrageous conduct necessary to overturn a valid conviction.
 
 [11]
 
 The DEA’s handling of Karl Fessler may not have been by the book, but it in no way arose to a level of misconduct that negatively impacted the defendant’s due process rights.
 

 We pause now to comment on the DEA’s investigative techniques. Defendant Olson has raised an oft repeated charge that the war on drugs is resulting in a war on civil rights. He maintains that court enforcement of convictions achieved by underhand
 
 *1483
 
 ed tactics results in an “end justifies the means” jurisprudence. We take heed to the words of Justice Brandéis in
 
 Olmstead v. United States,
 
 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):
 

 “Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means — to declare that the Government may commit crimes in order to secure the conviction of a private criminal — would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.”
 

 The DEA actions in question do not constitute misconduct or warrant a reversal but we wish to point out that this circuit never has and will not now condone shoddy law enforcement work in the name of the war on drugs for we are committed to the principle of justice for each individual.
 

 G. ENTRAPMENT
 

 In his pleadings and at trial, Olson argued that he was a victim of entrapment. Olson made no reference to entrapment in his appellant’s brief. Subsequent to filing his brief, the Supreme Court decided
 
 Jacobson v. United States,
 
 — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). In his reply brief, Olson cited
 
 Jacobson
 
 in support of his outrageous government conduct argument. He stated, “Conversely due process dictates fundamental fairness in preserving evidence and allowing the entrapped defendant to show that he was not so predisposed prior to contact and inducement by the government.” Reply Brief for Appellant at 2-3. In oral argument, Olson primarily emphasized the
 
 Jacobson
 
 case and its application to the entrapment instruction the judge gave at trial. He contended that in light of
 
 Jacobson,
 
 the jury instruction was inadequate.
 

 Jacobson
 
 held, “Where the government has induced an individual to break the law and the. defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable' doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents.”
 
 Jacobson,
 
 112 S.Ct. at 1540. The facts in
 
 Jacobson
 
 may be distinguished easily from those in the instant case.
 
 Jacobson
 
 involved a two-and-one-half-year operation by customs and postal officials, inducing the defendant to purchase illicit child pornographic materials. The only evidence of the defendant’s predisposition to purchase said materials was a prior purchase of similar materials (the prior purchase was not criminal at the time). The Court concluded that the government failed to' demonstrate the defendant was predisposed to purchasing the illicit materials prior to the beginning of the government inducement campaign.
 
 Id.
 
 at 1541.
 

 In the present case, copious evidence of Olson’s predisposition to commit the crime exists. The record reflects two prior felony drug convictions, a drug arrest during a probationary. period, frequent association with drug traders, and a quick reply to Fessler’s invitation to “talk business.” Moreover, the taped conversations reveal his willingness and familiarity with the drug trade in south Florida.
 

 We see no reason.to overturn this conviction based on the new standard enunciated in
 
 Jacobson.
 
 The trial court’s instruction to the jury, coupled with the wealth of evidence at trial, overcomes Olson’s claim of entrapment beyond a reasonable doubt.
 

 For the foregoing reasons, the convictions of Morris and Olson are
 

 Affirmed.
 

 [1]
 

 . The following day a forensic chemist at the DEA lab in Chicago tested the white substance and determined it to be cocaine.
 

 [2]
 

 . The DEA has paid Fessler nearly $60,000 for rewards, information and expenses.
 

 [3]
 

 . Standard procedure for a DEA “controlled buy” is to get approval for the disbursement, mark the bills, search the informant immediately before the buy, give him the money, keep him under surveillance as he enters and exits the premises, confiscate the drugs and search the informant again immediately after the exchange. Because Olson made the sample available' somewhat unexpectedly, Fessler and Agent Best were unable to follow the procedure. After Fessler turned over the sample, Best searched him and followed the procedure for the payment the next day.
 

 [4]
 

 . The "utterly unavailing” language refers to the value of the addresses in assisting cross-examination. Because Fessler had lived in a number of hotels for short periods of time, this defeated the rationale for making the addresses available.
 

 [5]
 

 . Fessler was convicted in Canada of fraud for the $8.7 million coffee deal. He was sentenced to two-years less one day, but in Canada, this only amounted to a misdemeanor, not a felony.
 

 [6]
 

 . This court has frequently discussed the use of "code language” by drug conspirators and concluded that a lack of reference to narcotics will not undermine a conviction. Use of code language is commonplace and judges and juries are entitled to infer reasonable meanings.
 
 United States v. Briscoe,
 
 896 F.2d 1476, 1496 (7th Cir.1990);
 
 United States v. Grier,
 
 866 F.2d 908, 921-22 (7th Cir.1989);
 
 United States v. Vega,
 
 860 F.2d 779, 797-98 (7th Cir.1988).
 

 [7]
 

 . This court has addressed the trust element required in high volume drug operations, con-eluding that only the most trusted individual would be permitted to transport valuable merchandise. “[I]t strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where that person did not have [the dealer’s] utmost trust and confidence. Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world____”
 
 United States
 
 v.
 
 Perry,
 
 747 F.2d 1165, 1169 (1984).
 

 [8]
 

 . Although this circuit does admit polygraph evidence in the discretion of the district court, we are cognizant of the great debate regarding . its admissibility and its reliability. For a recitation of the multifarious judicial results,
 
 see Le-nea v. Lane,
 
 882 F.2d 1171, 1175 (7th Cir.1989).
 

 [9]
 

 . Defendant’s counsel made no request to the court for a motion to strike Fessler’s reference to the polygraph nor for a curative instruction and thus has waived those issues on appeal.
 

 [10]
 

 . The prosecutor was seeking to show that Olson’s taxes did not correspond to his extravagant lifestyle and nominal income from assorted jobs. The inference being that he had extensive income from other sources, probably drugs.
 

 [11]
 

 . For a recitation of cases upholding claims of outrageous conduct, see
 
 United States v. Williams,
 
 858 F.2d 1218, 1226 (7th Cir.1988).