**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rufino GARCIA, Miguel Vaca and Federico Rivera, Defendants–Appellants.**

Nos. 93–1730, 93–1754 and 93–2014.

United States Court of Appeals, Seventh Circuit.

Argued * May 16, 1994.

Decided Sept. 14, 1994.

---

* Appeal Nos. 93–1730 and 93–1754 were submitted for decision without argument.

Barry R. Elden, Asst. U.S. Atty., Lance Malina (argued), Crim. Receiving, Appellate Div., James B. Burns, Office of the U.S. Atty., Chicago, IL, for U.S.

Marilyn J. Martin, Chicago, IL, for Rufino Garcia.

Frank Wesolowski, Lisle, IL, for Miguel Vaca.

Terence MacCarthy, Federal Public Defender, Office of Federal Defender Program, Nicholas A. DeJohn, DeJohn & Associates, Domingo F. Vargas (argued), Chicago, IL, for Federico Rivera.

Before CUMMINGS, HILL,** and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

A federal grand jury charged Miguel Vaca, Rufino Garcia and Federico Rivera–Borciaga in a two-count indictment alleging possession with intent to distribute cocaine and a conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841 and 846. Defendant Vaca entered a guilty plea to both counts of the indictment and was sentenced to 151 months of incarceration, fined $6,191 and ordered to serve a five-year term of supervised release. Defendant Garcia pled guilty to the conspiracy to distribute cocaine count and was sentenced to 120 months in prison followed by five years of supervised release. Defendant Rivera was found guilty by a jury of both counts in the indictment and sentenced by the court to serve 136 months in prison followed by five years of supervised release.

Defendant Rivera appeals his sentence, while counsel for defendants Garcia and Vaca have filed *Anders* briefs and seek to withdraw from representing their respective clients. We affirm the conviction of defendant Rivera and grant the motions of the respective defense counsel for Garcia and Vaca to withdraw as the attorneys of record. We dismiss Garcia and Vaca's appeals.

## I. BACKGROUND

Carlos Gonzalez was an informant for The Drug Enforcement Agency ("DEA") assigned to the Chicago, Illinois area. On January 19, 1992, based on a tip received from another DEA informant, Gonzalez phoned defendant Miguel Vaca and told him he was interested in purchasing cocaine. Gonzalez and Vaca met at a Chicago restaurant, Elias Tacos, later that day to discuss the possible drug transaction. Gonzalez was wired with a tape recorder and taped the conversation with Vaca. During their conversation, Vaca informed Gonzalez that the price was $20,000 per kilo of cocaine. Vaca also explained that he had recently driven a vehicle from California to Chicago, Illinois and transported cocaine.[1]

Telephone toll records reveal that the next day, January 20th, Vaca placed a call to C & R Auto, a garage located at 3359 S. Morgan in Chicago, Illinois, owned and operated by the defendant Federico Rivera. Although the conversation was not recorded, one of Rivera's employees testified at trial that Rivera "always answered [the phone]." Thus, at trial, the government argued the inference that Vaca conversed with Rivera. During the course of the day (January 20th), Vaca and Gonzalez spoke on the telephone several times. Early that evening, Vaca and codefendant Rufino Garcia arrived at Gonzalez's place of work (the Oakley Body Shop in Chicago, Ill.) and Vaca gave Gonzalez a small sample of cocaine.[2] At this time, Vaca told

---

** The Honorable James C. Hill, of the Eleventh Circuit, is sitting by designation.

1. Telephone records confirm a collect telephone call from Los Angeles to C & R Auto on January 4, 1992. The government argued that this phone call linked Rivera to Vaca's purchase of the cocaine in California.

2. The sample was tested by the DEA and determined to be 91% pure cocaine.

Gonzalez that the sale would take place either at the Oakley Body Shop or "over there in the garage" (presumably a reference to Rivera's body shop, C & R Auto). Later that evening, Gonzalez called Vaca and informed him that his (Gonzalez's) buyer (DEA Special Agent Mark Guiffre) liked the sample and they were ready to do the deal. At that time, Gonzalez inquired as to "how many cars" were for sale, i.e., how many kilograms of cocaine were for sale. Vaca advised Gonzalez he would call him back with the information. At about 8:30 p.m. on January 20th, telephone toll records reflect that a call was placed from Rivera's business, C & R Auto, to Gonzalez. This conversation was recorded and recounts Vaca (who was calling from C & R Auto) requesting to meet Gonzalez again to discuss the sale. Vaca, Garcia and Gonzalez in fact did meet at the corner of 18th and Carpenter in Chicago, Illinois, about fifteen minutes later Vaca informed Gonzalez that the drug sale could take place the next day (January 21st) and mentioned again that he recently transported the cocaine from California to Illinois.

At 12:05 p.m. the following day, January 21st, Vaca (who was at his home) and Gonzalez spoke on the phone and Vaca said the deal would be at 4:00 p.m. but he still did not know how many kilos were for sale. Telephone toll records indicate that a one-minute call was placed from Vaca's residence to C & R Auto at 12:07 p.m., immediately after Vaca and Gonzalez hung up, (the content of this call is unknown as the only calls recorded were those to and from DEA informant Gonzalez). At 1:55 p.m., Vaca called Gonzalez and told him the deal would be for "the two little zeros" (which Gonzalez interpreted to mean eight kilograms).[3] At 3:16 p.m., Gonzalez called Vaca and said he was picking up the buyer (Agent Guiffre). Vaca responded that the transaction was to take place at 4:00 p.m. near 18th and Loomis street in Chicago, Illinois. Vaca said he would call back when

he was ready. The telephone toll records reveal that at 3:25 p.m., immediately after they ended their call, Vaca placed a two-minute call to C & R Auto. After the call to C & R (Vaca presumably spoke to defendant Rivera since Rivera "always answers the phone"), at 3:27 p.m., Vaca placed another call to Gonzalez to tell him that only seven kilos would be available and not eight as originally stated.

At 4:20 p.m. Agent Guiffre, informant Gonzalez, defendant Vaca and defendant Garcia all met near Garcia's house at the intersection of 18th and Loomis in Chicago, Illinois, where Vaca counted Guiffre's money ($140,-000). While Vaca was counting the money, he remarked that he had a "good connection" in California who supplied his cocaine. Agent Guiffre and Gonzalez then waited approximately two hours for the drugs to arrive and during this timeframe had the opportunity to observe Vaca place several calls from a nearby pay phone while defendant Garcia appeared to be acting as a lookout. Around 6:20 p.m., Vaca returned to Agent Guiffre's vehicle (a two-door Toyota) and stated that the cocaine had arrived. Vaca pointed to a light blue Ford Crown Victoria across the street. After defendant Rivera got out of the Ford Victoria, he walked around to the rear of the car (trunk) where he looked cautiously from side to side. At this time, Vaca exited Agent Guiffre's vehicle and walked over to meet Rivera. Rivera opened the trunk, removed a white five-gallon bucket and carried the white bucket back to Guiffre's vehicle. Rivera handed the bucket to Vaca who placed it on the floor of the passenger's side of the Toyota. Vaca entered the vehicle and closed the door leaving Rivera on the sidewalk.

Agent Guiffre testified that Vaca removed one kilo of cocaine labeled "la reina"[4] from the bucket and handed it to him. After the agent opened the package and determined

---

3. As this court has frequently acknowledged, drug dealers usually use "code words" and "veiled allusions" in narcotics transactions in an attempt to conceal their conduct. Jurors must analyze these code words "in the context of the totality of the evidence" to understand their true meaning. *See United States v. Olson,* 978 F.2d 1472, 1479 n. 6 (7th Cir.1992); *United States v.*

*Martinez,* 937 F.2d 299, 306 n. 5 (7th Cir.1991); *United States v. Vega,* 860 F.2d 779, 795 (7th Cir.1988).

4. "La reina" is a well-known type of cocaine. Subsequent DEA tests of the cocaine revealed that it was 92% pure.

that it was cocaine, he gave the arrest signal to the surveillance team and as Vaca and Garcia were being arrested, Rivera fled the scene. About one hour and one-half after the drug bust, telephone toll records reveal that a call was made from C & R Auto to defendant Vaca's home. Thereafter, Agent Guiffre proceeded to C & R Auto where he located defendant Rivera in the passenger seat of a BMW driven by an unknown, young, hispanic male. The DEA agent followed the BMW several blocks and when the car stopped, Guiffre took Rivera into custody.

## II. *ISSUES*

The defendant, Rivera, raises two issues on appeal: (1) the sufficiency of the evidence establishing his participation in the conspiracy and his possession with intent to distribute cocaine; and (2) whether the trial court erred in instructing the jury that statements of coconspirators may be used to infer that Rivera was a member of the conspiracy.[5] We must also determine whether the respective counsel for defendants Vaca and Garcia have satisfied the requirements under *Anders* to withdraw from appellate representation of their respective clients.

## III. *DISCUSSION*

### A.

Defendant Federico Rivera's first argument is that the evidence offered at trial was insufficient to prove beyond a reasonable doubt that he was guilty of the charged crimes.

### 1. *Sufficiency of the Evidence*

When considering a challenge to the sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal of a conviction is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318, 99 S.Ct. at 2789–90.

### 2. *Conspiracy Charge*

██ Defendant Rivera's initial challenge is to the sufficiency of the evidence demonstrating his participation in a conspiracy to distribute cocaine. "When the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, substantial evidence should be the test rather than slight evidence or slight connection." *United States v. Olson*, 978 F.2d 1472, 1479 (7th Cir.1992) (quoting *United States v. Durrive*, 902 F.2d 1221, 1228 (7th Cir.1990)). A conspiracy is defined as "a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993).[6]

> "To prove that a defendant was a member of the conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant.... To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant [1] knew of the conspiracy and [2] that he intended to join and associate himself with its criminal design and purpose."

*Id.* at 344–45.

In his appellate argument, Rivera has attempted to focus our attention on the evi-

---

**5.** The statements, made by coconspirator Miguel Vaca, were: (1) on January 20, 1992 in a phone call from C & R Auto (Rivera's place of business) to DEA informant Gonzalez, Vaca stated that "I'm over here around 35th"; and (2) just minutes before Rivera arrived at the drug sale, Vaca told Agent Guiffre that a "guy" was bringing the cocaine.

**6.** In other words, a conspiracy is "an agreement to commit a crime." *United States v. Lechuga*, 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993).

dence the government failed to present, such as the lack of recorded conversations involving Rivera and the informant or Rivera and the other conspirators. Additionally, the defendant's attorney speculates that if Rivera were really the mastermind behind the drug deal he would not have exposed himself by delivering the cocaine to the scene of the sale. Rather, Rivera argues, Vaca was the mastermind and Rivera was manipulated into becoming an unwitting participant to transport the cocaine to the sale. We find this argument disingenuous and unpersuasive to say the least. The substantial evidence presented at trial establishes beyond a reasonable doubt the existence of the conspiracy and that Rivera was an active participant in it.

The most compelling evidence, of course, is the fact that he delivered the bucket containing seven kilograms of 92 percent pure cocaine to the prearranged location of the drug sale. When he arrived driving a vehicle with stolen license plates, rather than innocently carrying the bucket of cocaine over to Vaca, Rivera glanced from side to side in an attempt to make sure no one was watching the transaction. Once he felt certain that the coast was clear, he opened the trunk of the vehicle he was driving, removed the bucket of cocaine and carried it to the agent's vehicle where he handed the white bucket of cocaine to his coconspirator Miguel Vaca, who, in turn, placed it inside the agent's vehicle. Rivera obviously had the cocaine in his possession when he arrived at the sale, and his arrival at the scene was not mere chance, rather the jury could have inferred from the trial testimony that Rivera appeared at the sale only after Vaca had made the necessary arrangements during the series of phone calls to C & R Auto confirming that the buyer was now at the scene with the proper amount of cash. Rivera's delivery of the seven kilograms of cocaine alone is suffi-

cient to uphold the conspiracy charge for drug dealers would not entrust $140,000 worth of cocaine to someone who was oblivious as to what was actually going on. See *United States v. Tolson*, 988 F.2d 1494, 1504 (7th Cir.1993) ("it strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where that person did not have [the dealer's] utmost trust and confidence. Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world ...").[7]

The fact that Rivera delivered the cocaine to the sale, however, is not the only evidence implicating him in the conspiracy. The jury could certainly infer from the telephone toll records, the taped conversations and the testimony at trial that Vaca was in regular contact with Rivera[8] during the course of the transaction (January 20–21, 1992) and that it was Rivera who set the quantity of cocaine to be sold (seven kilograms). The fact that Rivera set the number of kilos for sale is made quite clear by the evidence that DEA informant Gonzalez called Vaca at 3:16 p.m. on January 21st and told him he was going to pick up the money for the deal. In this recorded phone call, Vaca stated that he would find out how many kilos were for sale and call Gonzalez right back. Telephone toll records reveal that very shortly thereafter, Vaca called C & R Auto at 3:25 p.m., where from trial testimony we know that it was Rivera and Rivera alone who answered the phone. Immediately after Vaca's 3:25 p.m. call to C & R Auto, he called Gonzalez at 3:27 p.m. and left a message on Gonzalez's pager. Telephone toll records reveal that very shortly thereafter Vaca placed two more calls to Gonzalez at 3:32 p.m. (one to his home and one to his pager). Gonzalez returned the calls at 3:34 p.m., and in a recorded conversa-

---

7. Moreover, based on the fact that Rivera arrived at the drug sale in a vehicle bearing stolen license plates and Rivera's flight from the scene of the crime, a reasonable juror could infer that he knew that a crime was being committed.

8. Telephone toll records reveal Vaca made three calls from his home to C & R Auto (Rivera's business), and Vaca made one call from C & R Auto to DEA informant Gonzalez. In addition,

while Agent Guiffre was waiting for the cocaine to be delivered, Vaca made two calls from a payphone, but the telephone company does not keep toll records of calls from payphones, thus, it is uncertain whether Vaca called C & R Auto. (But we do know that shortly after the last call Vaca made from the payphone, Rivera arrived at the scene of the drug sale with the cocaine.)

tion, Vaca informed him that only seven kilos were for sale and not the eight originally agreed upon. Considering the evidence in the light most favorable to the government, based on the content of the recorded calls, the timing of the unrecorded phone calls to C & R Auto, the testimony of one of Rivera's employees at C & R Auto that Rivera was the one who "always" answered the phone at the shop, and the fact that Rivera delivered the seven kilos of cocaine worth $140,000 to the scene of the drug sale, the jury could infer that Vaca was calling Rivera to determine the number of kilos for sale. At trial, the government argued not only that Rivera was a knowing participant in the conspiracy but that Rivera was in full control and possession of the cocaine prior to the sale and he was calling the shots. The government relied on the fact that Vaca called C & R Auto (Rivera) to ascertain the number of available kilos and Rivera delivered the previously agreed upon seven kilos of cocaine to the sale.

Additionally, after the initial contact between Vaca and DEA informant Gonzalez, Vaca placed a four-minute call to C & R Auto on January 20, 1992. As explained above, since Rivera was the owner of C & R Auto, Rivera always answered the phone at the garage, and Rivera was the one who delivered the cocaine to the sale, a reasonable juror could very well infer that Vaca was calling Rivera at C & R Auto to discuss details of the pending cocaine sale to Gonzalez. Also on January 20th, Vaca instructed Gonzalez that he would find out when the deal would take place and call him back. The telephone toll records reflect that Vaca called Gonzalez from C & R Auto on the afternoon of January 20th. Again, the government argues, and we agree, that it is reasonable to infer that Vaca went to meet Rivera, discuss the transaction, and then called Gonzalez to set up a second meeting to discuss the precise timing of the cocaine deal.

Finally, the jury heard evidence that Vaca had recently driven a vehicle containing cocaine from Los Angeles, California, to Chicago, Illinois, just prior to the January 21, 1992 drug sale with Agent Guiffre and informant Gonzalez. Vaca also mentioned to Gonzalez

and Guiffre that he had a good connection in California for obtaining cocaine. Telephone toll records confirm that on January 4, 1992, a collect call was made from Los Angeles to C & R Auto. Thus, the government argues in its brief that Vaca was most likely calling Rivera about the purchase of cocaine in California.

The combined direct and circumstantial evidence considered in the light most favorable to the government establishes beyond a reasonable doubt that throughout the course of the drug deal (between January 20th and 21st), Rivera was in frequent contact with Vaca (three phone calls, one personal visit and possibly two more calls from a payphone). Based on the fact Vaca always had to call C & R Auto (Rivera's business) to inquire about key details in the transaction and the fact that Rivera was the one in possession of the cocaine prior to the sale, delivered it to the sale and transferred possession of it to Vaca at the scene of the sale, the government argues that a reasonable juror would conclude that Rivera was the key figure in the conspiracy while Vaca was merely the go-between and Garcia was just a lookout. Thus, we reject the defendant Rivera's contention that there was insufficient evidence that he was a participant in the conspiracy.

### 3. *Possession Charge*

■ Secondly, defendant Rivera argues that the evidence is insufficient to meet the burden of proof required to establish that he knowingly possessed cocaine with the intent to distribute. He argues that because the bucket was sealed, he never saw the contents and thus did not know he was delivering cocaine. To convict Rivera of possession with intent to distribute the seven kilograms of cocaine, "the government had the burden of proving Rivera [1] knowingly or intentionally possessed cocaine; [2] possessed cocaine with the intent to distribute it; and [3] knew the substance was a controlled substance. *See* 21 U.S.C. § 841(a)(1)." *Olson,* 978 F.2d at 1479 (quoting *United States v. Troop,* 890 F.2d 1393, 1398 (7th Cir.1989)).

The defendant misunderstands the standard of review on appeal for he claims that a

reasonable inference is that Vaca used an unsuspecting individual to deliver the cocaine to the sale. Having been convicted by a jury of possession with intent to distribute cocaine, the issue on appeal is not whether the defendant's interpretation of the facts is reasonable, but "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We are convinced that the evidence recited above that Vaca frequently called Rivera's business to determine the quantity of cocaine for sale,[9] that Rivera delivered the cocaine to the sale in a vehicle that conveniently happened to have stolen plates, that he cautiously looked from side to side before removing the cocaine from the trunk of the car, that he personally kept the $140,000 worth of cocaine in his possession until he felt confident it was safe to deliver it to the prearranged sale site, as well as the evidence of taped conversations and phone records, establishes beyond a reasonable doubt that Rivera knowingly and intentionally possessed seven kilos of cocaine with the intent to distribute. Thus, we affirm the judgment of conviction on Count II.

### B.

██ Rivera's final argument is that the trial court erred when giving the coconspira- tor instruction to the jury. Specifically, the defendant objects to the following instruction:

> "In determining whether the alleged conspiracy existed and whether the defendant became a member of the conspiracy, you may consider the acts and statements of all the alleged participants. The agreement and membership may be inferred from all the circumstances and the conduct of all the alleged participants.

> Only the defendant's own words and acts show whether that particular defendant joined the conspiracy. You may consider statements by other persons in deciding what a particular defendant did and said or to help you understand defendant's acts and statements."

The defendant's argument regarding the coconspirator instruction[10] is without merit for we approved of this very instruction in *United States v. Olson*, 978 F.2d 1472, 1477–78 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993) (holding that the *instruction* properly "distinguish[ed] between the defendant's *conduct* (to show whether he joined the conspiracy) and additional admissible evidence to establish what the defendant did and said"). The instruction in the case before us is nearly identical to the instruction given in *Olson* thus there is no error.[11]

9. While none of the conversations from Vaca's residence to C & R Auto were recorded, as set forth *supra* at 1126–27, the jury could reasonably conclude from the *timing* of the phone calls (based on the telephone toll records) that Vaca was calling Rivera in the course of the conspiracy to determine the number of kilos for sale.

10. The instruction in *Olson* was as follows: "In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all the alleged participants. Only the defendant's own words and acts show whether he joined a conspiracy. But you may consider the statements of all the alleged participants to decide what it was that the defendant did and said or to help you understand the defendant's acts and words." *Olson*, 978 F.2d at 1478.

11. The defendant also suggests that the trial court erred in admitting two statements of co- conspirator Miguel Vaca. This argument also is without merit for coconspirator statements are admissible under Fed.R.Evid. 801(d)(2)(E) which provides that a coconspirator statement made "during the course and in furtherance of the conspiracy" is not hearsay if it "is offered against a party." For the statements to be admissible, the government only needed to establish by a preponderance of the evidence that there was a conspiracy, that the statements were made by a coconspirator in the furtherance of the conspiracy, and that the statements were offered against a party, i.e. against Rivera. *Bourjaily v. United States*, 483 U.S. 171, 175–78, 107 S.Ct. 2775, 2778–80, 97 L.Ed.2d 144 (1987). The evidence in this case, as set forth in Section III(A)(2), clearly establishes the existence of the conspiracy, that the statements of defendant Vaca were made in the furtherance of the conspiracy, and that the statements were offered against a party. Thus, there was no error in admitting the coconspirator statements.

### C.

Finally, we address the *Anders* briefs for defendant Garcia and defendant Vaca. In *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967), the U.S. Supreme Court set forth the appropriate procedure to be followed when appellate counsel seeks to withdraw:

"[I]f counsel finds his [client's] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous."

*Id.* This court interpreted *Anders* to hold that

"counsel renders constitutionally adequate assistance when he conscientiously examines the case; files a brief referring to anything in the record that might arguably support the appeal; forwards a copy of the brief to the defendant; and informs the defendant of his right to present to the court other issues which he feels have merit."

*United States ex rel. Russo v. Attorney General of Illinois*, 780 F.2d 712, 715 (7th Cir. 1986). We will grant the motion to withdraw if it appears that the potential issues on appeal are "groundless in light of legal principles and decisions." *United States. v. Eggen*, 984 F.2d 848, 850 (7th Cir.1993) (citing *McCoy v. Court of Appeals*, 486 U.S. 429, 436, 108 S.Ct. 1895, 1901, 100 L.Ed.2d 440 (1988)).

### 1. *Rufino Garcia*

Garcia's attorney, Marilyn Martin, identifies in her *Anders* brief the following potential grounds for appeal: (1) that the guilty plea was invalid because the prosecutor mis-

stated the mandatory supervised release term as being four rather than five years; (2) that the guilty plea is invalid because the defendant did not understand the charges; (3) that the factual basis for the guilty plea was inadequate; (4) that counsel was ineffective; and (5) that a condition in the term of supervised release was an abuse of discretion.[12] In a well-researched *Anders* brief, Garcia's counsel concluded that each of these arguments is "groundless." *Eggen*, 984 F.2d at 850. Pursuant to Circuit Rule 51(a), the defendant was given a copy of his counsel's motion to withdraw and the *Anders* brief. The defendant was given thirty days (until December 8, 1993) to file a response to his attorney's *Anders* brief requesting withdrawal from appellate representation, but no such response was ever filed. We agree with Garcia's appellate counsel that the five arguments set forth in the *Anders* brief are groundless and thus grant counsel's motion to withdraw and dismiss the appeal.

Defense counsel raises three potential arguments concerning the guilty plea ((1) the fact the prosecutor misstated the minimum term of supervised release, (2) that the defendant may not have understood the charges, and (3) that there may have been an inadequate factual basis for the plea). This panel has reviewed the transcript of the guilty plea hearing and we are convinced that the district judge complied with Fed. R.Crim.P. 11(c) in advising the defendant of his constitutional rights, the charges against him, the factual basis for the plea, and the minimum and maximum penalties. *See United States v. Padilla*, 23 F.3d 1220, 1221 (7th Cir.1994); *United States v. Saenz*, 969 F.2d 294, 297 (7th Cir.1992). Thus, any argument challenging the guilty plea would be frivolous. We also agree with Garcia's appellate counsel that a claim of ineffective counsel would be without merit. We note that this court generally cannot review ineffective assistance of counsel claims on direct appeal if the effectiveness of a trial lawyer's performance cannot be evaluated without an evidentiary hearing at which the lawyer is

---

12. There was no evidence that the defendant was a drug user as of the time of sentencing. The sentencing judge ordered that the defendant undergo substance abuse counseling if, in the future, evidence arises that he in fact was using drugs.

asked to explain why he chose a particular strategy. *Guinan v. United States,* 6 F.3d 468 (7th Cir.1993); *United States v. Taglia,* 922 F.2d 413, 418 (7th Cir.1991). Thus, this court has frequently instructed defendants to bring an ineffective assistance of counsel claim in a habeas corpus proceeding. *See id.* In the instant case, however, it appears that Garcia's attorney in the district court proceedings (including the guilty plea hearing) did all he could to make the evidence available to the defendant to allow him to make an informed decision as to whether to proceed to trial or plead guilty.[13]   Moreover, Garcia's counsel instructed him that in his professional opinion, if he (Garcia) proceeded to trial it was likely he would receive a longer prison sentence. Thus, there is nothing in this record to suggest that Garcia's attorney rendered "ineffective assistance of counsel" in the trial court under the *Strickland* standards. *See Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Finally, we are in agreement with appellate counsel that imposing a condition of substance abuse counseling is reasonable if, while the defendant is serving his sentence, evidence of drug use becomes known. *United States v. Sharp,* 931 F.2d 1310, 1311 (8th Cir.1991) ("court may order conditions of supervised release which are 'reasonably related to ... the nature and circumstances of the offense and the history and characteristics of the defendant, and ... to protect the public from further crimes of the defendant' ") (quoting U.S.S.G. § 5D1.3(b)).

Because we agree with counsel's belief that the above-enumerated grounds for appeal are without merit under the governing case law, and since we are unable to identify any meritorious grounds for appeal, we grant the motion to withdraw and dismiss the appeal of defendant Garcia.

### 2. *Miguel Vaca*

Frank Wesolowski, counsel for defendant Vaca, also filed an *Anders* brief and raised the following possible grounds for appeal: (1) that the defendant was entitled to a sentenc-

ing reduction for acceptance of responsibility based on the government's version of the offense; (2) that the court improperly imposed a $6,191 fine; and (3) that the court relied on inadmissible evidence at the sentencing hearing. Counsel concluded that each of these arguments was groundless and sought to withdraw from appellate representation. The defendant was notified pursuant to Rule 51(a) that his counsel asked leave of the court to withdraw from appellate representation and Vaca was given thirty days to respond. No response was filed. Agreeing with counsel that there are no valid grounds for appeal, we grant the motion to withdraw and dismiss the appeal.

■   We agree with counsel for Vaca that there is no merit to the claim that he is entitled to an acceptance of responsibility reduction solely because of the government's statement in its version of the offense that the prosecutor was aware of no reason to deny the acceptance of responsibility reduction. There is no case law supporting, much less mandating, that the government's recommendation or the probation officer's recommendation is binding on the sentencing judge. *United States v. Blythe,* 944 F.2d 356, 361 (7th Cir.1991) ("a sentencing judge is not bound by the presentence report's recommendations concerning sentence"). In addition, the trial court, as required by Fed. R.Crim.P. 11(c), clearly instructed Vaca in his guilty plea hearing that the court would have "the final decision as to what [his] sentence [would] be." Moreover, the record is quite clear that the defendant was less than truthful in describing his role in the offense to the prosecutor and to the probation officer. Under the commentary to U.S.S.G. § 3E1.1, a lack of truthfulness on the part of the defendant is grounds for denying the acceptance of responsibility reduction. U.S.S.G. § 3E1.1, comment. (n. 1). Not only was the denial of the acceptance of responsibility proper, but, as the probation officer stated at the sentencing hearing, the court might very well have been justified in enhancing the defendant's sentence under 3C1.1 for obstruction of justice. Thus, a

---

**13.** The court even adjourned the guilty plea hearing to allow the defendant to listen to tapes of conversations between the confidential informant and codefendant Vaca.

challenge to the denial of an acceptance of responsibility reduction would be groundless.

 Secondly, counsel concludes that the court's imposition of a $6,191 fine was not in error. The statutory maximum fine for Vaca's offenses was $8,000,000 while the Guidelines recommend a fine between $17,5000 and $175,000. The probation officer explained that as a federal prisoner, Vaca may earn an average of $1,000 per year, thus he recommended that Vaca be assessed a fine in the amount of $6,191, to be paid in $41 monthly installment payments while in custody. The sentencing judge accepted this recommendation ordering the defendant to pay monthly installments of $41 while in custody "to the extent of his ability to pay." Counsel for Vaca at sentencing did not object to the imposition of a fine at sentencing thus Vaca has forfeited the issue on appeal. *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (holding that when an issue is forfeited review is only for plain error); *United States v. Rivero*, 993 F.2d 620, 623 (7th Cir.1993). Given our recent cases affirming sentencing court's imposition of a fine and/or restitution when the defendant argues that he presently lacks the ability to pay, we agree that the fine imposed on defendant Vaca was reasonable. *See, e.g., United States v. Nelson*, 5 F.3d 254, 258 (7th Cir.1993); *United States v. Boula*, 997 F.2d 263, 268 (7th Cir.1993). In the instant case, the court considered the defendant's ability to pay and limited the fine to a portion of the income he might earn in prison to be paid in monthly installments. *See* 18 U.S.C.A. § 3572(d) (authorizing court to impose fine paid in installments); *United States v. Turner*, 998 F.2d 534, 538 (7th Cir.1993). Moreover, payment of the fine was only required while Vaca was "in custody" and to the extent of "his ability to pay." We agree with counsel that the restrictions on the parameters of the fine imposed reflects that the court considered the factors in U.S.S.G. § 5E1.2(d), and thus an appeal of the fine would be groundless.

Finally, the Federal Rules of Evidence state "The[se] rules ... do not apply in the following situations: ... sentencing...." Fed.R.Evid. 1101(d)(3); *United States v.*

*Johnson*, 997 F.2d 248 (7th Cir.1993). Thus, the court's reliance on evidence presented in the trial of defendant Rivera was entirely appropriate. We agree with counsel that possible grounds for appeal are without merit. Moreover, based on our review of the record, we are unable to identify any other grounds for appeal, thus, we grant the attorney's motion to withdraw and dismiss the appeal.

### CONCLUSION

We AFFIRM the conviction of defendant Federico Rivera–Borciaga. The *Anders* briefs comply with this court's standards set forth in *Russo*, 780 F.2d at 715; thus, the motions Frank Wesolowski and Marilyn Martin to withdraw from appellate representation of their respective clients, Miguel Vaca and Rufino Garcia, are GRANTED and their respective appeals are DISMISSED.