**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas Allen BERCHIOLLY,
Defendant–Appellant.**

No. 94–3166.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1995.

Decided Oct. 5, 1995.

**636**

John G. McKenzie, Asst. U.S. Atty. (argued), Office of the United States Attorney, Rockford, IL, for Plaintiff-Appellee.

Kevin E. Milner (argued), Chicago, IL, for Defendant-Appellant.

Before CUDAHY, COFFEY, and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Thomas Allen Berchiolly was convicted by a jury of one count of conspiring to possess with the intent to distribute cocaine and one count of attempting to possess with the intent to distribute cocaine. *See* 21 U.S.C. §§ 841(a)(1), 846. He was sentenced to 188 months of imprisonment to be followed by five years of supervised release. On appeal, Berchiolly challenges the sufficiency of the evidence, the district court's finding of the amount of cocaine attributable to him, and the two-level enhancement under the Sentencing Guidelines (§ 2D1.1(b)(1)) for possession of a dangerous weapon. We affirm.

## I. Background

Thomas Berchiolly was a member of a conspiracy led by Edward Mauerman that distributed cocaine in the Rockford, Illinois, area. The Mauerman group consisted of over twenty-seven individuals, including a distributor named Nate Milone. In 1989, one of Mauerman's cocaine suppliers was arrested and could no longer supply cocaine; Berchiolly and Milone offered to broker a deal with a new source, discovered by Berchiolly. Mauerman successfully completed three sales with Berchiolly's new source, totalling five or six kilograms of cocaine.

Sometime later, Milone again approached Mauerman and offered to serve as an intermediary with Berchiolly in a deal to purchase cocaine from another source known to Berchiolly: Eddie Valerio. Mauerman agreed and, according to the terms of the deal, gave Milone $112,000 as half payment for ten kilograms of cocaine, which Milone and Berchiolly were to deliver that day.

When Milone failed to return with the cocaine, Mauerman proceeded to Berchiolly's residence and found the two men. Milone explained that Berchiolly had given the money to Valerio and they were awaiting delivery of the cocaine. According to Mauerman, Milone was extremely nervous but Berchiolly appeared calm which caused Mauerman to suspect that perhaps Berchiolly was trying to steal the money. Mauerman demanded that the money be returned. That night, Milone and Berchiolly searched for Valerio but without success.

The following evening, Milone armed with a gun and Berchiolly, acting on a tip from Valerio's driver, entered the apartment of Valerio's girlfriend and found Valerio in hiding there. They also discovered Mauerman's money in a briefcase, although $10,000 to $12,000 was later determined to be missing. Berchiolly and Milone took Valerio to meet with Mauerman and a group of co-conspirators.

Believing that Valerio's driver, Edward Smith, may have retained some of the missing money, the group (along with Valerio) went to Smith's house. At least one member

of the group, "Big John" Bailey, was armed with a gun for "protection." After a heated argument between Smith, Milone, and Valerio, Smith turned over $1,500 and some jewelry to the group. Because some of the money was still missing, Berchiolly, Milone and two members of the Mauerman group brought Valerio back to his girlfriend's apartment, and upon further questioning of Valerio, they discovered the remainder of the money hidden in the apartment. After the money was recovered, Valerio was released.

In April 1990, Milone was arrested in Rockford, Illinois, on cocaine-related charges and agreed to cooperate with law enforcement agents in their efforts to break up the Mauerman organization. Thus Milone was wired with a concealed tape-recorder and recorded an incriminating conversation with Berchiolly concerning a cocaine deal. Thereafter, agents of the Federal Bureau of Investigation (FBI) confronted Berchiolly with the tape-recording. Berchiolly agreed to cooperate with the investigation and gave a detailed oral statement concerning his involvement in the Mauerman organization. With regard to the Valerio transaction, Berchiolly described himself as a broker between Mauerman and Valerio and that he had become concerned when Valerio failed to deliver the promised cocaine. According to an FBI agent, Berchiolly also stated that when he and Milone searched the apartment of Valerio's girlfriend, he was aware that Milone was armed with a gun.

In October 1993, Berchiolly was indicted and charged on two counts: first, conspiring with Mauerman and others to possess with the intent to distribute multiple kilograms of cocaine, and second, attempting to possess with the intent to distribute multiple kilograms of cocaine. See 21 U.S.C. § 846. Berchiolly pled not guilty.

At trial, Berchiolly testified that when he gave his oral statement to the FBI he overstated his role in an effort to impress the FBI agents and gain more favorable treatment and further that he never intended the Valerio transaction to be successful because he had always planned to steal the money from Mauerman and blame the deficiency on Valerio. Ultimately, Berchiolly testified, the

scheme to defraud Mauerman at Valerio's expense was intended to help Milone pay off drug debts that Milone owed. However, the jury convicted Berchiolly on both counts of the indictment.

In determining Berchiolly's sentence, the district court held Berchiolly responsible for between five and fifteen kilograms of cocaine, yielding a base offense level of 32 under the Sentencing Guidelines. Under U.S.S.G. § 2D1.1(b)(1), Berchiolly's offense level was enhanced by 2 points because his co-conspirators possessed firearms during the Valerio drug transaction. The combination of Berchiolly's final offense level of 34 with his criminal history category of III resulted in a guideline range of 188 to 235 months' imprisonment. The district court sentenced Berchiolly to 188 months' imprisonment on both counts, sentences to run concurrently, to be followed by five years of supervised release.

## II. Analysis

### A. Sufficiency of the Evidence

Berchiolly challenges the sufficiency of the evidence convicting him of attempting to possess with the intent to distribute cocaine. He does not challenge his conviction for conspiracy to possess with the intent to distribute cocaine. When reviewing a conviction for sufficiency of the evidence, we must consider the evidence and the accompanying inferences in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We will reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992)); *see also Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89. On appeal, we will not reweigh the evidence or re-evaluate the credibility of witnesses. *United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

Berchiolly argues that he could not be convicted of attempting to possess with the

intent to distribute cocaine based on the Valerio events because the Valerio deal was a sham and his intention was merely to defraud Mauerman of the drug money. According to Berchiolly, he did not believe that Valerio was capable of delivering the cocaine and knew that Valerio had previously engaged in a similar scam defrauding others of $60,000. In fact, Berchiolly claims he was using Valerio to commit a theft from Mauerman. In support, Berchiolly refers to his own trial testimony that he thought Valerio would be "the perfect fall guy because he had ripped off people in the past." Berchiolly also emphasizes that in his oral statement to the FBI, he did mention that the Valerio transaction was a "rip-off." Additionally, Berchiolly argues that at least two government witnesses' testimony support his theory: Don Davis, who was a member of the Mauerman group, testified that Valerio was not a major narcotic trafficker but "a nut." Also, Edward Mauerman testified that when Berchiolly and Milone failed to timely deliver the cocaine, he thought that perhaps Berchiolly was ripping them off.

 Berchiolly has misunderstood this court's role in reviewing his conviction. The issue on appeal is "not whether the defendant's interpretation of the facts is reasonable, but 'whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Garcia*, 35 F.3d at 1131 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789). "[T]he assessment of a witness's credibility is a matter inherently within the province of the jury, and absent extraordinary circumstances, this court will not reevaluate the testimony of a witness to determine his or her motives or other possible measures of reliability." *United States v. Hatchett*, 31 F.3d 1411, 1416–17 (7th Cir.1994) (internal quotation omitted).

We are convinced that the evidence is sufficient to support the jury finding that Berchiolly intended to obtain cocaine from Valerio for the drug conspiracy. First, prior to his attempt to obtain drugs from Valerio, Berchiolly had been an active participant in the conspiracy and had served the role of securing suppliers for Mauerman; he and Milone arranged for the sale of several kilograms of cocaine from another source and were paid a commission for their efforts by Mauerman. Thus, a reasonable juror could infer that Berchiolly had again intended to procure cocaine for the conspiracy, but this time from a new source: Valerio. Second, Berchiolly's actions after Valerio failed to deliver the cocaine permit the jury to infer that Berchiolly had initially expected that the Valerio deal would be consummated and later became concerned about being held responsible for the money. When Valerio failed to deliver the cocaine, Berchiolly together with other members of the drug conspiracy actively searched for Valerio, both on the night of the intended delivery and the following day. He contacted Valerio's driver, searched the apartment of Valerio's girlfriend, presented Valerio and the recovered cash to Mauerman, and continued his search for the rest of the money, questioning Valerio in the company of others until the money was produced and returned to Mauerman.

The sequence of events establishes that Berchiolly actively assisted Mauerman in every step of the search for Valerio and the purchase money. Berchiolly's actions are consistent with his original intent to obtain multiple kilograms of cocaine for the conspiracy, and obviously his own fear and realization that he may be held accountable for the missing money. The jury could have reasonably inferred that if Berchiolly had really intended to defraud Mauerman, he would have kept all of the money, or at least, given Valerio a smaller amount of money, instead of the lion's share. Berchiolly could have also come up with the name of a fictitious supplier so that no one would reveal his take in the purchase money. At a minimum, he would not have actively participated in a search for Valerio and brought Valerio before Mauerman, knowing that Valerio could contradict him as to the amount of purchase money supplied to Valerio. It is noteworthy to recall that when Berchiolly contacted the FBI to discuss his involvement with the Mauerman conspiracy, he stated that he had arranged for Eddie Mauerman to purchase ten kilograms of cocaine from Valerio but that Valerio had attempted to "rip off" the

money. Berchiolly made no mention of his own role in the Valerio scam. In light of the totality of the evidence, a reasonable juror could disbelieve Berchiolly's defense theory and in particular his theory that he used Valerio in an attempt to defraud Mauerman. As we have repeatedly held, the evidence need not exclude every reasonable hypothesis of innocence, and which version of the events to believe is up to the jury, not this court, to decide. *United States v. DeCorte*, 851 F.2d 948, 954 (7th Cir.1988); *see also United States v. Wilson*, 31 F.3d 510, 514 (7th Cir.1994) ("Unless the evidence is 'contrary to the laws of nature ... or is so improbable on its face that no reasonable factfinder could accept it,' we will not reweigh the evidence") (quoting *United States v. Saunders*, 973 F.2d 1354, 1358 (7th Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993)). The jury determined that Berchiolly's testimony was less than credible on this issue, and we very rarely disturb a jury's credibility determination unless it is irrational and unreasonable. *See Dortch*, 5 F.3d at 1065; *United States v. Mejia*, 909 F.2d 242, 245 (7th Cir.1990).

## B. Berchiolly's Sentence

### 1. Calculation of Drug Amount under U.S.S.G. § 2D1.1

██ Berchiolly next challenges the district court's finding of the amount of cocaine attributable to him. *See* U.S.S.G. § 2D1.1. The sentencing court determines the quantity of drugs involved in an offense by a preponderance of evidence, and we review the § 2D1.1 finding only for clear error. *United States v. Isirov*, 986 F.2d 183, 185 (7th Cir. 1993); *United States v. Cea*, 963 F.2d 1027, 1030 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992). We will reverse the sentencing court's determination of drug quantity only if we are left with a "definite and firm conviction that a mistake has been made." *United States v.*

*Corral–Ibarra*, 25 F.3d 430, 437 (7th Cir. 1994). Berchiolly claims that because he did not intend to obtain any cocaine from Valerio, the Valerio transaction should not have been used in calculating his sentence. Berchiolly ignores the fact that the jury had already found him guilty of the offense beyond a reasonable doubt, the conviction of which, as discussed above, is supported by sufficient evidence. Thus, the sentencing court was only left with the question of how much cocaine from the planned transaction was attributable to Berchiolly, and not whether Berchiolly had the requisite specific intent to commit the offense. Moreover, the sentencing court, like the jury, did not believe Berchiolly's self-serving testimony that the Valerio deal was a sham, and as we have emphasized frequently, such a credibility determination is entitled to deference on appeal because of the district court's ability to hear and observe the witnesses. *Hatchett*, 31 F.3d at 1416 ("It is the trier of fact who has the best opportunity to observe the verbal and non-verbal behavior of the witnesses focussing on the subject's reactions and responses to the interrogatories ... in contrast with merely looking at the cold pages of an appellate record.") (internal quotation omitted); *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993); *United States v. Campbell*, 985 F.2d 341, 347 (7th Cir.1993) ("Credibility judgments of witnesses are left to the sound discretion of the district court."). Although the district court did express some concern in determining whether Berchiolly should be held accountable for only five kilograms (the amount represented by the purchase money) or for the negotiated ten kilograms, the total drug quantity attributable to Berchiolly fell within the 5–15 kilogram sentence range regardless of whether he was held responsible for five or ten kilograms of cocaine from the Valerio deal.[1] In any event, Berchiolly does not challenge the district court's calculation of the quantity of cocaine attributable to him from the Valerio transac-

---

1. The district court found that Berchiolly was responsible for between five and ten kilograms of cocaine from the Valerio transaction as well as four kilograms from other transactions, yielding a possible range of nine to fourteen kilograms of cocaine attributable to Berchiolly. Because the guidelines dictate an offense level of 32 for any amount of cocaine between five and fifteen kilograms, the district court did not need to specify what amount from the Valerio transaction, between five and ten kilograms, that Berchiolly should be held accountable for. *See* U.S.S.G. § 2D1.1(c).

tion; his argument is that he should not be held responsible for the planned transaction at all because the transaction was a sham. As discussed above, Berchiolly's theory that he had no intention of possessing cocaine because he was only trying to defraud Mauerman was properly rejected by the jury and the sentencing court. There is no clear error.

## 2. Enhancement for Possession of Firearm

Finally, Berchiolly argues that the district court erred in imposing a two-level enhancement for his co-conspirators' possession of a dangerous weapon. Section 2D1.1(b)(1) of the Sentencing Guidelines provides for a two-level enhancement if a dangerous weapon (including a firearm) is possessed during the commission of a drug offense, "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3). A defendant can be held responsible for a co-defendant's possession of a firearm if the possession was in furtherance of a jointly undertaken criminal activity that was reasonably foreseeable by the defendant. *See* U.S.S.G. § 1B1.3(a)(1).[2] The district court's factual determination regarding the possession of a dangerous weapon during the course of a drug conspiracy is reviewed for clear error. *United States v. Banks,* 987 F.2d 463, 467 (7th Cir.1993).

The district court held Berchiolly responsible for the weapons possessed by two of his co-conspirators. The evidence reveals that guns were possessed on at least two occasions during the Valerio transaction. When Berchiolly and Milone went to the apartment of Valerio's girlfriend in an attempt to find Valerio and to retrieve the $112,000 purchase money, Milone was armed with a gun. Similarly, at the Smith residence where Berchiolly and members of the Mauerman group

questioned Smith and Valerio as to the location of the missing money, "Big John" Bailey, one of Berchiolly's co-conspirators, was armed with a firearm. Berchiolly argues that he had no prior knowledge of either conspirator's firearm and was surprised on both occasions to see the weapons. However, the issue is not when Berchiolly actually became aware of the weapons, but whether the possession was reasonably foreseeable.

In light of the sizable amount of drug money involved in this case, the district court could reasonably conclude that Berchiolly reasonably anticipated the possession of firearms by his co-conspirators. This court has noted that the drug industry is by nature dangerous and violent, and a reasonable factfinder is permitted to use his or her common sense in concluding that in a drug deal involving sizable amounts of money, the presence of firearms is foreseeable. *See United States v. Sandoval–Curiel,* 50 F.3d 1389, 1393 (7th Cir.1995); *see also United States v. Edwards,* 36 F.3d 639, 644 (7th Cir.1994); *United States v. Williams,* 31 F.3d 522, 526 (7th Cir.1994) (bringing $98,000 to a planned drug transaction suggests a heightened probability of weapons); *United States v. Gutierrez,* 978 F.2d 1463, 1468 (7th Cir.1992) (holding that where "defendants agreed to sell two kilograms of cocaine for $60,000 ... it was reasonably foreseeable that a gun would be carried in relation to the illegal transaction"); *United States v. Diaz,* 864 F.2d 544, 549 (7th Cir.1988) ("When an individual conspires to take part in a street transaction involving a kilogram of cocaine worth $39,-000, it certainly [was] quite reasonable to assume that a weapon of some kind would be carried."), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). Berchiolly and other members of the Mauerman group were seeking to recover the $112,000 in drug money from Valerio. The amount of money at stake was significant, and the dis-

---

2. U.S.S.G. § 1B1.3(a) provides that a defendant's relevant conduct, for purposes of determining the defendant's base offense level, includes:

 (1)(A) ....

 (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or

not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

trict court, as a fact-finder, could reasonably infer that while in pursuit of the drug money, Berchiolly foresaw the possession of firearms by his co-conspirators. We disagree with Berchiolly's argument and agree with the trial court that the presence of the guns was reasonably foreseeable.

The convictions and sentences of Thomas Allen Berchiolly are AFFIRMED.